UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Mai V., | Case No. 0:18-cv-2994-KMM |
| Plaintiff, | |
| v. | ORDER |
| Andrew Saul, *Commissioner of the Social Security Administration*, | |
| Defendant. | |

Mai V. (hereinafter "Ms. V") brought this action challenging the denial of her Social Security disability insurance benefits and supplemental security income by the Commissioner of the Social Security Administration ("SSA").[1] This matter is before the Court on the parties' cross-motions for summary judgment. Pl.'s Mot., ECF No. 14; Def.'s Mot., ECF No. 16. For the reasons set forth below, Ms. V's motion is denied, the Commissioner's motion is granted, and this matter is dismissed.

I. Background

Ms. V is a forty-one-year-old immigrant from Thailand with a high school education. For many years, she has suffered from fatigue, depression, anxiety, anemia chronic pain, muscle stiffness, and tremors in her extremities. She has sought treatment from myriad medical professionals and has been diagnosed with several different conditions. These ailments have resulted in Ms. V oscillating between various medication regimens in the hope of managing her symptoms. Throughout the record are persistent complaints by Ms. V of fatigue, anxiety, muscle tightness and torpor. Also consistent are conflicts between differing medical assessments regarding the severity and extent of Ms. V's impairments as well as instances of medication noncompliance.

Ms. V filed an application for disability insurance benefits and supplemental security income on March 6, 2015. Admin. R. ("R") at 305–09, ECF No. 12. She alleged

---

[1] Andrew Saul became the Commissioner of the SSA after this case was filed. He is automatically substituted as the defendant pursuant to Fed. R. Civ. P. 25(d).

1

disability benefits beginning May 1, 2014. R. at 305. The SSA denied her claims on April 29, 2015, and upon reconsideration on July 15, 2015. R. at 200–05, 212–18. Subsequently, Ms. V requested a hearing before an Administrative Law Judge ("ALJ"). R. at 219–20. On May 24, 2017, ALJ Virginia Kuhn heard testimony from Ms. V and medical expert Dr. James P. Felling, Ph.D, who specializes in clinical psychology. R. at 14, 67. Following testimony, Ms. V agreed to amend her onset date to September 16, 2015, at which point ALJ Kuhn ended the hearing. R. at 79–80.

On July 7, 2017, ALJ Kuhn referred Ms. V's case to the agency's Office of Inspector General, Cooperative Disability Investigations Unit ("CDI") on suspicion of malingering. R. at 335, 340. Following the referral, Special Agent Schmiel set up surveillance outside of Ms. V's home on August 1, 2017. R. at 341. During surveillance, Special Agent Schmiel followed a vehicle driven by Ms. V's boyfriend departing from Ms. V's residence to an Ikea store in Bloomington, Minnesota. *Id.* Upon arrival, Ms. V, her boyfriend, and her three young children all exited the vehicle and entered the store together. Once inside, Special Agent Schmiel tracked Ms. V for at least forty minutes. R. at 342. During this time, Ms. V held her toddler son while they rode up an escalator together, spoke on her cellphone, took a picture of her children sitting on a bed, inspected items, and manipulated a rug without noticeable difficulty. R. at 341–42. Ms. V was also observed walking independently without an assistive device, maintained a normal gait, did not have a noticeable tremor, only sat down twice (each time for only a few moments), and was not noticeably anxious or distressed despite being surrounded by other shoppers. *Id.* After making these observations for nearly an hour of shopping, Special Agent Schmiel broke off surveillance. R. at 342. CDI subsequently put together a report describing the results of the investigation.

The CDI report was issued on September 5, 2017. R. at 336. The report was served on the parties and Ms. V requested a supplemental hearing. R. at 270. Before the second hearing, the CDI report as well as additional medical records were added into the record. A supplemental hearing was held on February 27, 2018. R. at 81, 295. During the second hearing, testimony was taken from Ms. V, her boyfriend, and a vocational expert ("VE"), Jesse Ogren. R. at 88, 102, 118. ALJ Kuhn issued a written decision denying Ms. V's claim on June 26, 2018. R. at 14.

In her decision, ALJ Kuhn followed the five-step sequential evaluation process outlined in 20 C.F.R. § 420.1520(a)–(g). R. at 15–17. The ALJ found that Ms. V had not engaged in substantial gainful activity ("SGA") and currently has several severe impairments, including: 1) major depressive disorder; 2) generalized anxiety disorder; 3) post-traumatic stress disorder; 4) spastic paraparesis; and 5) degenerative disc disease of the spine. R. at 17. The ALJ determined that Ms. V's diagnoses of hypertension and thyroid disorder only minimally affected her ability to work, and thus were not severe impairments. *Id.* ALJ Kuhn also determined that there was insufficient evidence in the record to consider bipolar disorder and fibromyalgia as medically determinable impairments. *Id.* Despite having several severe impairments, none of them, alone or in combination, were sufficient to meet the listed impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. at 17–24.

Next, the ALJ determined Ms. V's residual functional capacity ("RFC"). Specifically, ALJ Kuhn found that Ms. V retained the capacity to perform light work with additional limitations, including that Ms. V's work must: 1) consist of routine 3-4 step tasks; 2) have fixed, predictable instructions; 3) be limited to occasional brief and superficial contact with co-workers and the public; 4) not require teamwork and collaboration; 5) not have high production quotas; 6) not consist of work at unprotected heights, with hazards, or tasks that would require balancing; 7) not require climbing of ladders, ropes or scaffolds with only occasional climbing of ramps and stairs; and 8) only require occasional stooping, kneeling and crouching, and no crawling. R. at 24. Due to these limitations, Ms. V was not able to return to her previous work. R. at 33. However, based on Ms. V's age, work experience, RFC and the testimony of VE Jesse Ogren, ALJ Kuhn found that there are jobs that exist in significant numbers in the national economy that Ms. V can perform. R. at 33. Work as a housekeeper, garment bagger, inserter, and other sedentary work[2] were all jobs that fit within Ms. V's RFC. R. at 33–35. Therefore, Ms. V was found not disabled within the meaning of the Social Security Act. R. at 35.

Ms. V sought review of the ALJ's decision from the Social Security Appeals Council, but her request was denied. R. at 1–5. As such, the ALJ's decision became the final ruling of the Commissioner. She brings this action arguing primarily that the ALJ

---

[2] During the hearing, the VE testified concerning sedentary jobs such as an unskilled polisher, laminator, and stuffer. R. at 123.

failed to fully and fairly develop the record. Thus, Ms. V seeks a remand with instructions to obtain more medical opinions regarding the effect of her combination of impairments.

II.     Legal Standard

Review of the Commissioner's denial of an application for disability benefits is limited and deferential, requiring the denial to be affirmed if it is supported by "substantial evidence" on the record as a whole. *Gann v. Berryhill*, 864 F.3d 947, 950 (8th Cir. 2017); *Cline v. Colvin*, 771 F.3d 1098, 1102 (8th Cir. 2014). Substantial evidence is less than a preponderance of the evidence, but is such relevant evidence that a reasonable person would find it adequate to support the ALJ's determination. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). A reviewing court must consider not only the evidence that supports the conclusion, but also that which detracts from it. *Bergmann v. Apfel*, 207 F.3d 1065, 1068 (8th Cir. 2000). However, the Commissioner's decision will not be reversed simply because substantial evidence might also support a different conclusion. *Gann,* 864 F.3d at 950. So long as the Commissioner's decision falls within the "available zone of choice," it should be affirmed. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). In other words, where the Commissioner's decision is among the reasonable conclusions that can be drawn from the evidence on the record as a whole, it will not be disturbed. *See Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007); *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011).

III.    Discussion

Ms. V raises two main arguments in response to the Commissioner's denial. First, relying on the Eighth Circuit's decision in *Pate-Fires v. Astrue*, Ms. V argues that the ALJ erroneously "played doctor" by determining that Ms. V's issues were the result of medication non-compliance.  564 F.3d 935 (8th Cir. 2008). Next, she contends that the

ALJ failed to fully and fairly develop the record to adequately consider the combination of her impairments. For the reasons that follow, the ALJ's decision is affirmed.[3]

### A. *Pate-Fires*: Non-Compliance as a Symptom of Mental Disorders

Ms. V argues that the ALJ incorrectly relied on time periods in which she experienced more severe symptoms due to her noncompliance with medications. She claims this was wrong because noncompliance was *itself a symptom* of her mental impairments as she had trouble with her concentration and memory. Pl's Mot. at 36–37 (citing *Pate-Fires*, 564 F.3d at 946–47 ("ALJ's determination [claimant's] medical noncompliance is attributable solely to free will is tantamount to the ALJ 'playing doctor,' a practice forbidden by law.")). Specifically, she claims that her mental impairments—namely depression and anxiety—resulted in reduced cognitive function that caused her medication noncompliance. Thus, this "symptom" should not be considered against her. However, Ms. V's argument misconstrues the holding of *Pate-Fires* and is not supported by the record as a whole.

In *Pate-Fires*, the claimant suffered from severe mental impairments including schizoaffective disorder and had a long history of psychotic episodes, which often resulted in fits of violence and homicidal threats. *Pate-Fires*, 564 F.3d at 937–41. In fact, the *Pate-Fires* claimant was institutionally committed on numerous occasions due to the severity of her psychotic episodes and underwent intensive forms of mental-health treatment. *Id.* Due to these circumstances, the court found that noncompliance was a

---

[3] In her brief, Ms. V also intimates that the ALJ erroneously gave greater weight to some medical assessments over others. Since Ms. V failed to fully develop such an argument, it is only briefly addressed here. Specifically, Ms. V suggests in passing that the ALJ should have given greater weight to the opinions of Dr. Curt Levang, Ph.D, LP, Dr. Barron, Ph.D, LP, and Dr. Felling on "Paragraph C" criteria. Pl's Mot. at 34. However, an ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). And, a treating physician's opinion "does not automatically control, since the record must be evaluated as a whole." *Id.* (quoting *Bentley v. Shalala*, 52 F.3d 784, 786 (8th Cir. 1995) (internal quotations omitted)). Since, as discussed below, the opinions to which Ms. V would have the ALJ give greater weight are inconsistent with other substantial evidence it was not error for the ALJ to disregard those opinions. *Id.* at 791; *See Clevenger v. Social Security Administration*, 567 F.3d 971, 974 (8th Cir. 2009) (finding an ALJ need not accept a treating physician's opinion where it is inconsistent with substantial evidence).

5

"medically-determinable" symptom of her mental illness, and disability could not be denied on that basis. *Id.* at 945. The court emphasized that "the relevant question [is]: whether [a claimant's] failure or even refusal to follow the treatment was a *manifestation* of [a claimant's impairments]." *Id.* at 946 (emphasis added). In *Pate-Fires*, the evidence "overwhelmingly" demonstrated noncompliance was attributable to the claimant's mental illness as she consistently denied the existence her condition, maintained an attitude of distrust and suspicion of her physicians, suffered from paranoid delusions and often displayed manic behavior. *Id.* The court held where there is overwhelming evidence that treatment noncompliance is a medically-determinable symptom of a mental impairment, such that it is a manifestation of the impairment, noncompliance cannot be the basis for finding a claimant not disabled. *Id.* at 946–47.

Here, Ms. V's mental-health impairments fail to meet the threshold set by the *Pate-Fires* court because she does not demonstrate that noncompliance was a medically determinable symptom that it is a manifestation of the impairment. *Id.* Although there is some evidence that Ms. V's memory, concentration, and insight were limited, particularly in Dr. Levang's reports based on Ms. V's subjective complaints, there is substantial evidence to the contrary. Indeed, in contrast to Ms. V's subjective reporting, many of her providers found she had normal cognitive function with intact memory, attention, and concentration during the time period between May 2015 and February 2018. R. at 812, 879, 1023, 1130, 1379–80, 1507, 1581, 1665, 1671, 1675, 1713. For instance, from May 2015 to December 2017 Ms. V's medication manager, Carol Thersleff, CNP, consistently reported that she was alert, oriented, and maintained normal thought process with intact insight, memory, and judgment. R. at 812, 879, 1380, 1581, 1665. Ms. V's primary care physician, Dr. Sarah Hammes, MD, found her "alert, cooperative, [with] no distress" during an appointment on February 23, 2016. R. at 1022. In appointments during the second half of 2017, Megan Schmittdiel, PA-C, reported Ms. V had "intact" short and long term memory as well as no notable cognitive limitations. R. at 1671, 1675. Finally, during a medication consultation with Erika Bower, PharmD, in February 2018, Ms. V was found to know her medications "somewhat well," as she knew their names and could give a "general indication" of what they were for at a time when she was prescribed eight different medications. R. at 1713. In fact, the only consistent complaints regarding cognitive function Ms. V had during this period was daytime somnolence. R. at 1670–1677. However, Ms. Schmittdiel believed this was the result of Ms. V taking higher doses

of her medication than prescribed. *Id.* Despite a warning to that effect, Ms. V actually increased the amount of Carbidopa-Levodopa (i.e. Sinemet) she was taking. R. at 1675. Overall, the record does not support a finding that noncompliance was a medically determinable symptom of Ms. V's illnesses such that it was a manifestation of her impairments.

The Eighth Circuit's decision in *Wildman v. Astrue*. 596 F.3d 959 (8th Cir. 2010), further supports this conclusion. In *Wildman*, the claimant similarly suffered from depression and alleged concentration and memory limitations, which she argued prevented her from complying with her physician's instructions. *Id.* at 965. However, in rejecting the application of *Pate-Fires*, the *Wildman* court emphasized that the claimant in *Pate-Fires* suffered from a severe case of schizoaffective disorder, often spiraling into manic behavior and paranoid delusions. *Id.* at 966. Thus, the *Wildman* court noted that in *Pate-Fires* there had been overwhelming evidence that noncompliance was a symptom of her mental disorders. *Id.* Moreover, medication noncompliance is common among persons with such disorders. *Id.* In contrast, the court found that the *Wildman* claimant suffered from depression and there was little evidence "expressly linking [claimant's] mental limitations to such repeated noncompliance." *Id.* And, as here, there was conflicting medical evidence regarding the severity of claimant's alleged memory and concentration impairments. *Id.* Consequently, the *Wildman* court found *Pate-Fires* inapplicable. *Id.*

Cases decided after *Wildman* are consistent with its narrow interpretation of *Pate-Fires*, often declining to find treatment noncompliance to be a symptom of depression and anxiety: *See, e.g., Hensley v. Colvin*, 829 F.3d 926, 935 (8th Cir. 2016) (given the record as a whole, there was no evidence that claimant's noncompliance "was a medically-determinable symptom of [his] mental illness."); *Kriss S. v. Berryhill*, No. 18-cv-0389, 2019 WL 542942, at * 9 (D. Minn. Jan. 16, 2019) (finding that, based on claimant's activities of daily living, statements by her physicians, and her own inconsistent statements, there was no "objective" medical evidence that noncompliance was a symptom of her depression and anxiety as required by *Pate-Fires*); *Flint v. Colvin*, No. 13-cv-1220,2014 WL 2818665, at *23 (D. Minn. June 23, 2014) (where claimant suffered from anxiety and depression, she failed to establish "overwhelming" evidence indicating noncompliance as a symptom of her mental impairments); *Clark v. Astrue*, No. 11-0577, 2012 WL 512572, at *8-9 (D. Minn. Jan. 20, 2012) (*Pate-Fires* inapplicable because

claimant suffered from depression and no evidence directly links his mental impairments to failing to seek treatment).

Ms. V's case is like those in which courts have found *Pate-Fires* inapposite. The overall inconsistency in the record regarding her concentration and memory does not support a finding that noncompliance was a manifestation of her mental impairments. Indeed, the record is devoid of objective evidence to establish medication noncompliance as a medically determinable symptom of her conditions. This is a far cry from the overwhelming evidence found in *Pate-Fires*. In sum, the ALJ did not improperly consider medication noncompliance. *See Kriss S.*, 2019 WL 542942, at *9 (after considering claimant's activities of daily living and statements made by her treating physicians, the record lacked overwhelming evidence that noncompliance was a symptom of her mental impairments). For these reasons, the Court finds that the ALJ did not err in considering Ms. V's periods of medication noncompliance.

### B. ALJ's Responsibility to Fully and Fairly Develop the Record

Ms. V next argues is that ALJ Kuhn failed to adequately develop the record on which she based her decision. Particularly, she contends that the ALJ should have acquired additional opinions from treating sources to determine how the combination of her impairments affected her ability to work and whether she would have been expected to see improved functioning had she complied with her medication regimen. Pl's Mot. at 36–38. Essentially Ms. V claims that the ALJ lacked an adequate basis in the record to make an RFC determination.[4] However, this argument is unpersuasive. As discussed below, the ALJ did not fall short of her obligation to properly develop the record and the RFC determination was supported by substantial evidence in the record.

It is well settled that an ALJ has an obligation to "fully and fairly" develop the administrative record in social security disability cases. *See, e.g., Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000); *Lauer v. Apfel*, 245 F.3d 700, 706 (8th Cir. 2001); *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010); *Combs v. Berryhill*, 878 F.3d 642, 646–47 (8th Cir. 2017). This duty

---

[4] Ms. V's argument can be read as asserting that the record was inadequately developed both as to medication noncompliance and as to the RFC ultimately adopted. The first aspect of this claim is fully addressed in section III.A., above, and will not be restated here.

"exists independent of the claimant's burden" because, although the claimant is entitled to counsel, the disability hearing is "non-adversarial." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). As such, the ALJ must neutrally develop the facts. *Snead*, 360 F.3d at 838. However, an ALJ need not seek "additional clarifying statements from a treating physician unless a crucial issue is undeveloped." *Stormo*, 377 F.3d at 806; *See also Vossen*, 612 F.3d at 1016; *Combs*, 878 F.3d at 647; *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) (duty to seek clarification from treating physician "arises only if a crucial issue is undeveloped"). In other words, the ALJ must further develop the record only when the evidence is insufficient to reach a conclusion about whether the claimant is disabled. 20 C.F.R. § 404.1520b(b). Where there is substantial evidence upon which an ALJ can make a decision, the duty to develop is met. *Haley v. Massanari*, 258 F.3d 742, 749–50 (8th Cir. 2001). Here, the ALJ fully developed the record as no crucial issue was underdeveloped and the denial was based on substantial evidence.

Here, the ALJ fully developed the record: no crucial issue was underdeveloped, and the ALJ's RFC finding was based on substantial evidence. To make an RFC finding, an ALJ must consider "all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his or] her limitations." *Combs*, 878 F.3d at 646 (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)). An RFC must be supported by some medical evidence. *Steed v. Astrue*, 524 F.3d 872, 875 (8th Cir. 2008). That said, there is no requirement that an RFC be supported by a specific medical opinion. *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). What is more, an RFC determination is not limited to consideration of medical evidence exclusively. *Harvey v. Colvin*, 839 F.3d 714, 717 (8th Cir. 2016). An ALJ may consider all the record evidence, so long as some supporting evidence from a professional is considered. *See* 20 C.F.R. § 404.1545. Ultimately, an ALJ "bears the primary responsibility" for assessing a claimant's residual functional capacity based on all the relevant evidence. *Wildman*, 596 F.3d at 969 (internal quotations omitted).

Here, the record as a whole demonstrates that substantial evidence, both medical and otherwise, supports the RFC finding. On multiple occasions from November 2015 to November 2017, Ms. V was found to have either a normal or only slightly abnormal gait, was able to ambulate effectively during appointments without an assistive device, did not have a tremor or only a very mild one, and was found to have full range of motion in her

extremities with normal strength. R. at 936, 940, 944, 1018, 1022, 1214, 1309, 1313, 1432, 1528, 1675. In an appointment with Dr. Hammes on November 23, 2015, Ms. V was reported to be "[a]ble to ambulate around the exam room with equal movement, strength and normal coordination of the upper and lower extremities symmetrically." R. at 936. Another appointment with Dr. Hammes on September 15, 2016, demonstrated Ms. V was still able to walk around the room without assistance and had restricted tremors, yet she still requested a walker. R. at 1214. Merely two months later, on November 22, 2016, Dr. Hammes reported Ms. V was "all normal" referencing no sign of tremors and Ms. V could still move around the room with equal movement strength and normal coordination. R. at 1309.

At a May 5, 2017 appointment, Dr. Hammes did not report a tremor, reported normal ambulation, and noted Ms. V recalled what medications she was taking without having them with her. R. at 1430–32. However, it was reported that Ms. V was using a walker upon her arrival. *Id.* That said, during this time, on May 2, 2017, Ms. V saw neurologist Dr. Robert G. Jacoby, MD, who observed muscle tightness and tremors. R. at 1424. Dr. Jacoby hypothesized these issues were the result of her medications and provided an updated prescription. R. at 1424–25. A month later, Ms. V reported to Dr. Hammes with a cane, but was noted to walk around the exam room with only slight stiffness. R. at 1527–28. At this appointment, Dr. Hammes specifically noted that a medication shift was helping. R. at 1527. Indeed, a follow-up with Dr. Jacoby found Ms. V's symptoms significantly improved with better arm swing, ambulation, and less muscle tightness. R. at 1500. During appointments with Dr. Jacoby's office in late 2017, Ms. Schmittdiel reported a full range of motion in the upper and lower extremities, normal cognition, 5/5 strength, and a normal gait. R. at 1670–77. In fact, the only issues which Ms. Schmittdiel noted were the result of medication noncompliance. *Id.* This evidence provides a substantial basis to support the ALJ's RFC determination.

Finally, as ALJ Kuhn found, the medical evidence and other evidence in the record are not entirely consistent with Ms. V's subjective complaints. This finding requires consideration of several factors: the claimant's daily activities; the duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 2008). In making a determination based on these criteria, subjective complaints

may be discounted "if there are inconsistencies in the evidence as a whole." *Baldwin*, 349 F.3d at 558. These factors need not be examined methodically so long as they are weighed against the entire record, *See Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000), and the list is not exhaustive. Moreover, credibility is primarily for the ALJ to assess, not the courts. *Schwandt v. Berryhill*, 926 F.3d 1004, 1012 (8th Cir. 2019) ("[W]e will defer to credibility determinations that are supported by good reasons and substantial evidence."); *Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir. 1987). Here, the ALJ's conclusion that Ms. V's subjective complaints are inconsistent with the evidence as a whole is well supported by the record.

In many of her visits to the office of treating psychologist, Dr. Levang, during the period between March 2015 and January 2018, Ms. V complained of uncontrollable anxiety attacks, an inability to go out into the public due to her anxiety, chronic pain, muscle stiffness, lack of energy, confusion, and an inability to walk for more than five minutes without an assistive device, and she would present with poor personal grooming as well as noticeable tremors. R. at 831–38, 899–905, 951–954, 1165–75, 1350–60, 1482–88, 1612–19. On one such visit, Ms. V claimed she did not go to a Hmong New Year celebration because merely thinking about the large crowds made her shaky. R. at 954. Based on all of Ms. V's subjective complaints, Dr. Levang opined that her mental-health symptoms were "slow progressing" in treatment. R. at 1678. However, Ms. V's subjective complaints are inconsistent with much of the evidence in the record over the same time period.

For instance, at many of Ms. V's physical therapy sessions she would arrive without a walker and declined to use the facility's walker after therapy sessions lasting approximately forty-five minutes. R. at 984, 1060, 1066, 1068, 1071, 1100–01, 1471. At a September 2017 appointment with Dr. Hammes, Ms. V appeared "well" with "no apparent distress" and there was no note of tremors. R. at 1530–32. In addition, Ms. Thersleff often provided quite different reports regarding Ms. V's overall appearance, physical symptoms, and mental functions when compared to her subjective complaints to Dr. Levang. Ms. Thersleff found Ms. V generally appeared suitable, maintained acceptable physical functions, and her cognition was intact. R. at 812, 879, 1108, 1112, 1376, 1581, 1665.

Ms. V's activities of daily living during the relevant period were also not entirely consistent with her subjective complaints. She was the only adult at her residence, was the primary caretaker of her three young children, searched for a preschool for her youngest child, went to church, took her children to the mall and swimming at the YMCA, went to a church picnic, presented as well-groomed with a clean living space at a mental-health evaluation, and sought Section 8 housing primarily by herself. R. at 1124, 1144, 1147, 1448, 1158, 1626, 1632. And she was observed by CDI shopping without assistance at a crowded store. R. at 340–42. This, considered in conjunction with the evidence demonstrating higher levels of mental and physical functioning discussed above, provided ample evidence for the ALJ to discount Ms. V's subjective complaints based on their inconsistency with the record as a whole.

Considering the substantial evidence supporting ALJ Kuhn's RFC determination, she had no further duty to develop the record. ALJ Kuhn's determination was supported by both medical and nonmedical evidence and there was adequate support in the record as to all crucial issues. Moreover, substantial evidence supported the ALJ's finding that Ms. V's subjective complaints were not entirely consistent with the record as a whole. As such, this 1714-page record was sufficiently developed and it supports the RFC finding.

## IV. Conclusion

Based on the discussion above, Mai V's Motion for Summary Judgment **[ECF No. 14]** is **DENIED**, the Commissioner's Motion for Summary Judgment **[ECF No. 16]** is **GRANTED**, and this action is **DISMISSED WITH PREJUDICE**.

**Let Judgment be entered accordingly.**

Date: November 20, 2019         *s/Katherine Menendez*
                                Katherine Menendez
                                United States Magistrate Judge